**WOODS SERVICES, INC., Petitioner,**

v.

**DEPARTMENT OF PUBLIC WELFARE, Respondent.**

Commonwealth Court of Pennsylvania.

Argued June 12, 2002.

Decided July 17, 2002.

---

Thomas E. Coval, Willow Grove, for petitioner.

Daniel Fellin, Harrisburg, for respondent.

BEFORE: McGINLEY, J., SIMPSON, J., and MIRARCHI, JR., Senior Judge.

OPINION BY Judge SIMPSON.

Woods Services, Inc. (Woods) petitions for review of the order of the Secretary of the Department of Public Welfare (Secretary) that reversed the decision of the Bureau of Hearings and Appeals (BHA) and denied Woods' applications for licenses (Licenses) to operate two intermediate care facilities for the mentally retarded (ICF/MR) on the same property. We reverse.

Woods is a non-profit organization located in Langhorne, Pennsylvania, which provides educational and residential services to certain mentally retarded individuals at a campus-based facility. Woods is licensed by the Department of Public Welfare (DPW) pursuant to the regulations governing operation of community homes for individuals with mental retardation. 55 Pa. Code §§ 6400.1—6400.275.

In 1992, Woods applied to the Pennsylvania Department of Health (DOH) for a certificate of need (CON) for a proposed 102 bed ICF/MR.[1] DOH issued the CON. DPW's Office of Mental Retardation endorsed the CON, but restricted Woods to serving residents of New York, New Jer-

---

1. An intermediate care facility is an institution which is licensed under state law to provide a level of care which is specially designed to meet the needs of persons who are mentally retarded, or persons with related conditions, who require specialized health and rehabilitative services. 55 Pa.Code § 1181.2.

sey and Maryland. By endorsing the CON, DPW certified that there was a need for the proposed ICF/MR.

Thereafter, Woods applied to DPW for the necessary Licenses to operate two ICF/MR facilities on their campus to serve out-of-state residents. DPW, however, declined to act on Woods' applications stating "the Department has decided not to act on these applications since no benefit to the citizens of the Commonwealth would result from such action." (Reproduced Record) R.R. 5a.

In 1995, Woods filed a complaint in equity and mandamus with this Court seeking an order directing DPW to consider its applications. On August 1, 1996, this Court issued an opinion and order directing DPW to consider the applications and issue a decision within 60 days. *Woods Services v. Dep't of Public Welfare*, 681 A.2d 238 (Pa.Cmwlth.1996).

Pursuant to that order, Nancy Thaler, DPW's Deputy Secretary for Mental Retardation, visited the facilities in person to conduct an assessment. Within days, Thaler sent a letter denying the applications. Thaler based the denial on the grounds that state and federal law require integration of persons with disabilities and favor small homelike residences over large institutional facilities.[2]

Woods appealed to the BHA. Several hearings were held before hearing officer Karen Burdell Castelli, Esquire. Expert testimony revealed that the mentally retarded individuals Woods seeks to serve also suffer from severe physical maladies. These individuals require an intensive care regimen that greatly limits their mobility. Further, Woods' medical director explained that the individuals are a "medical-ly fragile population" with severe problems that are not commonly seen in the "ordinary population." R.R. 65a. The physical disabilities include severe hydrocephalus with shunting, spinal cord injuries, hypopituitarism and complex brain malformations.

Following the hearings, the hearing officer issued a thorough and thoughtful opinion concluding that Woods was entitled to the Licenses. The basis of her opinion was that DPW's stated preference for smaller, integrated facilities was not based upon existing regulations or published policy. In her opinion, the hearing officer made the following significant findings of fact:

23. On September 19, 1996, Ms. Thaler sent Robert Griffith, President of Woods, correspondence denying the application for (a) license(s) to operate the facilities because "state and federal law require integration of persons with disabilities—and hence favor small, homelike residences over large institutional ones, ..." In addition, "large or campus based facilities are presumptively unsuitable for new residential licenses." The "... Department, therefore, is precluded by § 1007 of the Public Welfare Code, 62 P.S. § 1007, from licensing large, new residential facilities *irrespective of the degree of compliance with applicable regulations*" (emphasis added.)

24. Other than referring to the size of the proposed facilities, the Department's denial notification included no claims that the proposed facilities were unsuitable for other reasons.

25. The parties stipulated that the license denial is not based on any criteria in 62 P.S. § 1026(b)(2), (3), (4) or (5), but

---

**2.** In support, Thaler relied on *In re Schmidt*, 494 Pa. 86, 429 A.2d 631 (1981) and *Helen L. v. DiDario*, 46 F.3d 325 (3d. Cir.1995).

is based on (b)(1), which requires denial for "violation of or non-compliance with the provisions of this act or of regulations pursuant thereto."

26. DPW has adopted the federal ICFMR regulations in their entirety and had not added to them at the times pertinent to this case.

27. The federal regulations address "suitability" only as it relates to suitability of the program for an individual and suitability of individuals for placement in an ICFMR facility.

28. This so-called "policy" of a preference for small units and against larger ones had never been officially promulgated or publicized at any time pertinent to this case.

The director of the BHA subsequently issued an order adopting, in its entirety, the hearing officer's opinion.

Thereafter, DPW filed a motion for reconsideration of the BHA's order with the Secretary. The Secretary granted the motion. Ultimately, the Secretary issued a final order setting aside the BHA's order. The Secretary's order did not set forth findings of fact, nor did it specifically reject any facts found by the hearing officer and adopted by the BHA. In its order, the Secretary stated that the BHA erred by failing to recognize the broad discretion held by licensing authorities in interpreting and applying licensing law. Further, in determining that Woods is unsuitable to operate an ICF/MR, the Secretary concluded DPW did not abuse its discretion. Woods filed a timely appeal challenging the Secretary's order.

On appeal, Woods contends that its proposed ICF/MR satisfies all published licensing standards. Woods further maintains that the Secretary erred by relying on unpublished policy in determining that the proposed ICF/MR is not "suitable." We agree.

 Our review of a final order of DPW is limited to determining whether an error of law was committed, whether constitutional rights were violated or whether necessary findings of fact are supported by substantial evidence. *Britt v. Dep't of Public Welfare*, 787 A.2d 457 (Pa.Cmwlth. 2001). Where, as here, the Secretary does not reverse any facts found by the hearing officer, these findings, if supported by substantial evidence, are binding on this Court. *Cf. Boss Insulation & Roofing, Inc. v. Dep't of Labor and Industry*, 722 A.2d 778 (Pa.Cmwlth.1999) (since the Secretary did not reverse credibility findings made by the hearing officer they are binding on this Court).

 As to the substantive issue, we must determine whether the Secretary committed an error of law by denying Woods' applications based on an unpublished policy favoring small, integrated facilities. We conclude that she did.

In her order, the Secretary cites *Batoff v. State Bd. of Psychology*, 561 Pa. 419, 750 A.2d 835 (2000) and *Ferguson v. State Bd. of Funeral Directors*, 768 A.2d 393 (Pa.Cmwlth.2001) as authority for the position that the BHA failed to recognize the broad discretion held by licensing authorities to interpret and apply licensing law.[3]

**3.** *Batoff* involved a psychologist's appeal of the Board of Psychology's imposition of disciplinary measures against him. We reversed on appeal, holding that the Board impermissibly based its judgment on its own opinion rather than the evidence in the record. The Supreme Court disagreed, holding that this Court exceeded its authority by reweighing the evidence rather than determining whether substantial evidence existed to support the Board's findings. Thus, the Board's interpretation of existing statutory and regulatory requirements was upheld.

These cases, however, involve disciplinary measures imposed against professional occupational licensees. Moreover, these cases involve interpretation of existing and published statutory and regulatory provisions.

Here, unlike in *Batoff* and *Ferguson*, we are not reviewing an agency interpretation of professional occupational licensing law as it relates to a professional licensee. Rather, we are reviewing DPW's denial of a license to a facility it concedes is otherwise qualified merely because of the facility's failure to comply with unpublished policy. Simply put, the cases cited by the Secretary do not support the position that an agency may interpret a general term in a statute based upon unpublished regulations or policy. The Secretary erred when she relied on these cases to set aside the BHA's order.

The Secretary also relied on *Second Breath v. Dep't of Public Welfare*, 731 A.2d 674 (Pa.Cmwlth.1999) for the proposition that DPW's determination that the proposed ICF/MR is "unsuitable" was not an abuse of discretion. This case is also distinguishable. In *Second Breath*, the facility requested that DPW waive a published regulation requiring that its CEO possess a college degree. DPW denied the request. On appeal, we upheld the denial because applicable regulations plainly required that Second Breath's CEO have a college degree. We concluded that DPW's decision not to waive its clearly written and reasonable requirement that the proposed CEO have a college degree did not amount to an abuse of discretion.

Unlike in *Second Breath*, here there are no "clearly written" regulations justifying denial of the Licenses. DPW's preference for small facilities over larger ones was never officially promulgated or published at any time pertinent to this case. In an attempt to evade the lack of applicable regulations, DPW asserts that the proposed facilities are unsuitable for the purpose they seek to fulfill. The Secretary erred when she relied upon *Second Breath* to support setting aside the BHA's order.

Section 1007 of the Public Welfare Code,[4] (Code) requires DPW to issue licenses when certain conditions are met. That Section provides:

> When, after investigation, the department is satisfied that the applicant or applicants for a license are responsible persons, that the place to be used as a facility is *suitable for the purpose*, is appropriately equipped and that the applicant or applicants and the place to be used as a facility meet all the requirements of this act and of the applicable statutes, ordinances and regulations, it shall issue a license and shall keep a record thereof and of the application (emphasis added).

62 P.S. § 1007.

This section requires DPW to issue a license when it is satisfied that a proposed facility meets all applicable regulations. It does not give DPW unbridled discretion to apply unpublished policy in the absence of regulations and use such unpublished policy as an aid in making licensing decisions. When read in the context of Section 1007, the term "suitable" indicates that a proposed facility must be suitable for the pur-

---

Similarly, in *Ferguson*, the State Board of Funeral Directors imposed sanctions on a licensed funeral director. We affirmed the imposition of disciplinary measures holding that the Board must be afforded deference in the interpretation of its rules and regulations.

Because the licensee's conduct constituted a violation of applicable law, the Board did not err in the interpretation of its regulations.

**4.** Act of June 13, 1967, P.L. 31, *as amended,* 62 P.S. § 1007.

pose for which it seeks licensure. Here, "suitable for the purpose" means the proposed facility must be suitable to operate as an ICF/MR. DPW cites no authority for its position that the proposed ICF/MR is unsuitable. On the contrary, existing federal regulations do not support the Secretary's action.

With regard to intermediate care facility services for the mentally retarded, Pennsylvania has adopted the federal regulations in their entirety.[5] 55 Pa.Code § 6600.3. The federal regulations provide: the stated basis and purpose of the regulations; their relationship to other Health and Human Services regulations; the requisite governing body and management required of each facility; the requisite client protections; the facility staffing requirements; active treatment services; client behavior and facilities practices; health care services; physical environment; and dietetic services. These regulations contain no provisions stating a preference for either integrated facilities over segregated facilities or smaller facilities over larger ones.

The Commonwealth Documents Law[6] (CDL) establishes a process for the issuance of regulations that includes public notice of a proposed rule, receiving comments from interested parties, and holding hearings when appropriate. Under Section 102 of the CDL, a "regulation" is "any rule or regulation, or order in the nature of a rule or regulation, promulgated by an agency under statutory authority in the administration of any statute administered by or relating to the agency." 45 P.S. § 1102. "The process by which regulations are issued provides an important safeguard for potentially affected parties against the unwise or improper exercise of

discretionary administrative power." *Dep't of Environmental Resources v. Rushton Mining Co.*, 139 Pa.Cmwlth. 648, 591 A.2d 1168, 1171 (1991).

On the other hand, a "statement of policy" tracks a statute and does not expand upon its plain meaning; such a statement need not be issued in accord with the CDL. Unlike a regulation, a policy statement announces the agency's tentative intentions for the future. *Pennsylvania Human Relations Comm'n v. Norristown Area Sch. Dist.*, 473 Pa. 334, 374 A.2d 671 (1977). A statement of policy is transformed into a regulation by undergoing notice and comment pursuant to Section 01 of the CDL. 45 P.S. § 1201; *Rushton Mining Co.* If an agency believes that a statement of policy has worked well, and the agency does not desire to have that policy repeatedly adjudicated, the agency can issue it as a proposed regulation and invite notice and comment. *Id.* However, where, as here, the agency applies the policy in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued. *Giant Food Stores v. Dep't of Health*, 713 A.2d 177 (Pa.Cmwlth.1998) (decision based on provision of unpublished handbook rendered invalid); *Rushton Mining Co.; Hardiman v. Dep't of Public Welfare*, 121 Pa.Cmwlth. 120, 550 A.2d 590 (1988) (DPW's position regarding disability benefits which appeared only in a personnel manual is not legally binding).

Here, DPW concedes that the proposed ICF/MR satisfies all existing statutes and regulations. DPW contends that it is "unsuitable" because it fails to comply with DPW's preference for small, homelike facilities. This preference, however, is not

---

5. 42 C.F.R. §§ 483.400 483.480.

6. Act of July 31, 1968, P.L. 769, *as amended*, 45 P.S. §§ 1102–1602.

reflected in governing statutes or regulations. DPW's failure to properly publish its preference favoring integration and to properly promulgate it as a regulation at any relevant time is fatal to its argument.[7]

Moreover, DPW failed to sufficiently defend the policy when challenged. None of the BHA's findings support the refusal to license. The Secretary erred when she ignored the BHA's findings and set aside its order based on a misperception of the breadth of DPW's discretion.

■■ Because of the resolution of this case, the remaining arguments raised by the parties need not be considered.[8] Accordingly, we reverse the final order of the Secretary.

## ORDER

AND NOW, this 17th day of July, 2002, the order of the Secretary of the Department of Public Welfare is reversed.

---

7. If, as DPW maintains, it has followed a policy favoring integrated services for decades, DPW has had ample opportunity to adopt a regulation in accordance with the CDL. *See In re Schmidt*, 494 Pa. 86, 429 A.2d 631 (1981) ("normalization" approach to treatment under the Mental Health and Mental Retardation Act is reflected in the regulations promulgated by the Secretary attendant to the Act) and *Helen L. v. DiDario*, 46 F.3d 325 (3d Cir.1995) (Federal regulations attendant to Title II of the Americans with Disabilities Act require administration of programs or activities in the "most integrated setting appropriate").

8. We reject DPW's argument, raised for the first time at oral argument, that this Court lacks subject matter jurisdiction based on *Snisky v. Pennsylvania State Police*, 799 A.2d 961 (Pa.Cmwlth.2002) (state police candidate who had not yet commenced service did not have property right in employment and decision to disqualify applicant was not an adjudication).

DPW's argument, that its unsupported refusal to license a facility is not an adjudication and that Woods has no legal recourse, is absurd. This is the second time the case has been before this Court. Further, the statute requires DPW to issue a license unless there has been a failure to comply with statutes or regulations. 62 P.S. § 1007. A refusal to grant a license in the absence of any statutory or regulatory basis is an adjudication within our jurisdiction to review. *See, e.g., Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667 (3d Cir.1991) (entity which meets all objective criteria under state law for a license may possess a property interest even though the license sought has not yet been obtained).