Troiani Group and Troy Development
Associates, L.P.

v.

City of Pittsburgh Board of Appeals,
and City of Pittsburgh,
               Appellants

:
:
:
:
:
:
:
:
:
:
:

No. 1127 C.D. 2021
Argued: February 7, 2022

BEFORE:   HONORABLE ANNE E. COVEY, Judge
               HONORABLE ELLEN CEISLER, Judge
               HONORABLE STACY WALLACE, Judge

OPINION BY
JUDGE COVEY                            FILED:  March 21, 2022

          The City of Pittsburgh (City) Board of Appeals (Board) and the City (collectively, Appellants) appeal from the Allegheny County Common Pleas Court's (trial court) September 7, 2021 order reversing the Board's July 26, 2021 decision (Decision After Remand).  In its Decision After Remand, the Board denied Troiani Group's and Troy Development Associates, L.P.'s (collectively, Troiani) appeal from the City's Department of Permits, Licenses, and Inspections' (PLI) denial of an emergency demolition plan (Demolition Plan) for Troiani's building located at 209 First Avenue in the City (First Avenue Structure), and adjacent Troiani-owned buildings located between 100-108 Market Street (Market Street Structures).  The sole issue for this Court's review is whether the Board properly denied Troiani's appeal.  After review, this Court reverses the trial court's order.

          The First Avenue Structure is a six-story building with a basement, which has been vacant for approximately 50 years.  The Market Street Structures are two- to four-story buildings that have been vacant since the early 2000s.  In April 2020, due to its deteriorating condition, Troiani sought PLI's approval for the First

Avenue Structure's emergency demolition (Emergency Demolition Application).[1] On May 5, 2020, PLI's Assistant Director of Construction and City Building Code Official David Green (Green) denied the Emergency Demolition Application. Troiani appealed from PLI's denial to the Board. On June 26, 2020, after a hearing, the Board reversed PLI's denial of the Emergency Demolition Application and authorized the First Avenue Structure's immediate emergency demolition. Troiani retained structural engineers and demolition experts to prepare the Demolition Plan. Thereafter, Troiani submitted its Demolition Plan for the First Avenue Structure to PLI. Troiani's Demolition Plan indicated that the Market Street Structures' demolition was necessary to safely demolish the First Avenue Structure. Accordingly, the Demolition Plan provided for demolition of the First Avenue Structure and the Market Street Structures.[2]

By September 3, 2020 letter (September 3, 2020 denial letter), Green notified Troiani that PLI denied the Demolition Plan. Green stated therein:

---

[1] PLI's private demolition permit process provides:

Applications for Commercial Structures require submission of drawings or narrative prepared and sealed by **a [Pennsylvania] licensed architect or engineer** that document:

o   Intended demolition operations: method of demolition, type of equipment to be used, and staging of equipment.

o   Protection measures for adjacent buildings and/or properties.

o   Protection measures for pedestrians in the public right of way.

https://pittsburghpa.gov/pli/private-demo (last visited Mar. 18, 2022) (emphasis added); *see also* https://apps.pittsburghpa.gov/redtail/images/14153_Revised_Private_Demo_Requirements.pdf (last visited Mar. 18, 2022).

[2] The trial court's affirmance of the City Planning Commission's August 18, 2020 decision that denied Troiani's project development plans for the demolition of the Market Street Structures is the subject of a separate appeal before this Court at *Troiani Group & Troy Development Associates, L.P. v. City of Pittsburgh Planning Commission, City of Pittsburgh & Lumania Properties, L.P.* (Pa. Cmwlth. No. 85 C.D. 2021, filed Mar. 21, 2022).

1. This review is for the demolition of [the First Avenue Structure] only. Demolition of [the Market Street] [S]tructures need[s] to be addressed under their respective permit applications. These applications are:

a. DP-2019-03315: 106/108 Market [Street].

b. DP-2019-03314: 104 Market [Street].

c. DP-2019-03311: 100/102 Market [Street].

2. Please note that the demolition of [the Market Street Structures] requires approval from the [City's] Planning Commission [(Planning Commission)]. As it stands, the Planning Commission has denied the demolition of these structures. PLI has no direct authority to grant the demolition of these structures. Additionally, while the contract for demolition identifies demolition of these structures, this permit will be limited to demolition of [the First Avenue Structure].

The submitted documentation shall be revised to establish a plan for the demolition of [the First Avenue Structure] that does not include the demolition of adjacent structures. You may appeal PLI's decision to the [Board]. . . .

3. Your engineer proposes that protection measures related to the demolition of [the First Avenue Structure] include the demolition of [the Market Street Structures]. Please note[,] as discussed[,] these types of measures are not required by the [*International Building Code of 2015* (Building Code)[3]] and it is not standard industry practice to demolish adjacent structures as a protection measure. Further, [Troiani's Structural Engineer, Chuck] Cornely [(Cornely),] has identified that vibrations from demolition of the adjacent structures could cause the collapse of [the First Avenue Structure] and that the fall zone into Market Street is the same whether the Market Street [Structures] are demolished first or not. Given the above, PLI does not deem demolition of the Market Street [Structures] a necessary protection measure.

---

[3] Section 403.21 of the Uniform Construction Code, 34 Pa. Code § 403.21, in pertinent part, adopted Chapters 2-10, 12-29, and 31-35, and Section 3006 of the Building Code.

3

Reproduced Record (R.R.) at 190a-191a. Troiani appealed to the Board from PLI's decision.

The Board conducted a hearing on September 15, 2020. Troiani presented testimony from structural engineers Cornely and Dirk Taylor (Taylor), and demolition contractor Tim Schaaf (Schaaf). Cornely drafted the First Avenue Structure's Demolition Plan. He testified: "The demolition of the buildings along Market Street will reduce the potential for damage to the buildings across Market Street and reduce the potential for life [sic] and increased life safety for people using Market Street and people in the buildings across Market Street." R.R. at 242a. Specifically, Cornely confirmed that "[t]he only means to minimize the life safety concerns for a controlled demolition of [the] First Avenue [Structure] is to first demolish the Market Street [Structures]." R.R. at 244a. He reasoned that "[e]liminating these, demolishing these buildings on the east side of Market Street[,] will absolutely reduce the risk of damage to the buildings on the west side of Market Street . . . ." R.R. at 248a.

Cornely explained:

> [There's] an 8[-]foot alley between [the First Avenue Structure] and the rear walls of the buildings along Market Street. That alley, the width of that alley precludes any kind of protection of the buildings along the east side of Market Street. It's all part of a convoluted situation of risk of actually fairly big proportions. The reducing [sic] of risk to the buildings on the west side of Market Street by demolishing the buildings on the east side of Market Street is, in my opinion, a very good move to limit damage from the potential uncontrolled and unexpected collapse of [the First Avenue Structure] to the west and onto the buildings along the east side of Market Street.

R.R. at 249a.

When asked why the First Avenue Structure could not be brought down without falling to the west, Cornely expounded:

4

> The situation is this [—] [t]he wall that we see on the first floor, the first floor brick bearing wall with the brick courses, brick wythes [are] missing on the exterior of that wall, that wall has approximately . . . .
>
> . . . .
>
> 60[%] of its strength. The point is it's very weak. In addition to that, those bricks that are exposed along that first floor west bearing wall are, they are not stable. Any disturbance, any vibration can further remove the brickwork in that wall. That can happen at any time.
>
> That's what's got me so excited myself [sic] because it's like a straw that will break the camel's back. If you do work inside that building, you're liable to disturb that brick and displace that brick because of the deteriorated mortar in that brickwork of that first floor. That's why it's dangerous. This is something that's incipient. Any vibration may be the straw that breaks the camel's back.
>
> Even demolishing . . . that building at 100 Market Street, if the contractor is not successful in pulling the west wall, the west rear wall of that building at 100 Market Street to the west, and there are bricks that fall onto that first floor wall, that damaged and unsafe and unstable first floor wall of [the First Avenue Structure], [it] is liable to come down while he is demolishing those buildings.

R.R. at 250a-252a. Cornely later added: "[T]o provide protection for the [Market Street Structures] is virtually impossible because you cannot do construction activities in that 8-foot alley without potentially vibrating and moving bricks in that unsafe and deteriorated first floor west wall of the [First Avenue Structure.]" R.R. at 268a-269a.

> Cornely further stated:
>
> [T]here is always risk with the machinery operating in the vicinity of the building. That's why there's so much concern. That's why we are trying to plan for the unexpected and uncontrolled collapse of the [First Avenue Structure]. There's no doubt that the stomping, the movement of the heavy equipment around the [First

5

Avenue Structure] could also produce vibrations that would loosen brick in that unsafe portion of the first floor wall of [the First Avenue Structure]. This thing is a very ticklish situation and is fraught with danger as we go. That's why there is the emphasis on trying to reduce the amount of exposure of the lives of the workmen when we are demolishing this building and demolishing the [Market Street Structures].

R.R. at 269a-270a.

Taylor testified that he reviewed Cornely's assessment and the Demolition Plan. *See* R.R. at 218a. Taylor related that he visited the First Avenue Structure and Market Street Structures, reviewed the interior and exterior conditions and, based on his observations, investigation and analysis, he agreed with Cornely's conclusions. *See id.* Taylor described:

[I]f [the First Avenue Structure] . . . falls on top of [the Market Street Structures], depending on the manner of the fall and how much of the [First Avenue Structure] is left, it is most likely to -- it under certain circumstances could actually end up creating pressure within the building with a correct blast that would not only push the buildings[] over[,] but could also end up projecting portions of the front wall outward as a result of that interior pressure that could build up under certain collapse circumstances.

R.R. at 227a-228a.

Taylor confirmed the "extreme[] likel[ihood]" that "the impact from a collapsing taller building at [the First Avenue Structure's location] falling onto the roofs of [the Market Street Structures] would push these buildings onto and possibly even across Market Street and First Avenue, presenting a major danger to public safety and likely causing significant property damage[,]" and that the pressure could project "pieces of brick, glass and timber outward like shrapnel." R.R. at 228a-229a. Taylor concluded:

In my opinion, based on the condition of the lower west wall, the most heavily loaded portion of that wall, and

6

looking at the conditions throughout all the floors in the building at [the First Avenue Structure], I feel that the risk is extremely high that under any reasonable demolition circumstance, there's a very high risk that that's going to fail no matter what's done . . . . My feeling is that there is a high likelihood that no matter what's done, that building is going to end up collapsing based on its current condition.

R.R. at 233a.

When asked if it was possible to shore up the First Avenue Structure to remove the deteriorating west wall, Taylor responded:

Because there is so little lateral instability [sic] in there, I would not feel safe being involved in any kind of a shoring system that would unload that wall. There is no measurable lateral stability in that building, in my opinion, right now. The front wall of the building is all glass. The back wall is propped up with windows and things like that. It's also cracked and severely deteriorated. All the beam connections to the wall at every floor, the beams are shrunk, the beams are rotted. There's no mechanical connections between the beams and walls. It's all friction. It's 150[-]year-old or 100[-]year-old friction connections that are all failed and inadequate. It's my opinion there is no measurable lateral stability. Which is why I would not put a shoring crew in there, based on the conditions that I have seen.

R.R. at 233a-234a.

Schaaf described the usual demolition method for buildings like the First Avenue Structure as follows:

Conventionally, a building of this size and this nature, the way that it's structured, we would take the top of the building off. Our Stage 1 would be to go inside and pull the floors around the perimeter walls from the inside approximately 3 foot [sic] inward of the building, which would give us somewhere to drop the brick from the top of the building down to the basement. That's not possible with this building because there is not an engineer out there that we found that would sign off on a plan to put our

7

guys inside that building because of the possibility of collapse.

Our second option would be to go to the top of the building, which is part of Phase 2 of the [D]emolition [P]lan, and take some weight off of that wall. Once again it poses the same factor, that any brick that comes from the top of the building, anything that falls down to the bottom, because that alleyway is only 8 foot [sic] wide at the bottom, and the building overhangs, there's only 6 foot [sic], so any brick that falls doesn't necessarily fall straight down. They fall outward. The buildings along Market Street are in such bad condition that even a handful of brick that hit [the] back of those buildings are going to cause the rear brick facades of [the] Market Street [Structures] to collapse into the building along First Avenue. At that point, we have guys right there. I don't want anybody getting killed there.

As the City Solicitor stated, we are mobilized. We are one of two companies in the [City] area that can even reach a building of that magnitude. We have a high-reach excavator onsite. Buildings this size are not meant to be let go this long and be able to be a controlled demolition on the way down. It's a high risk from our end because [] this building is going to be top heavy.

The way that we take the buildings apart is basically the way they were constructed. The wooden beams serve as our support from east to west. We will go through and systemically take those out on the way down from top to bottom. You have a certain level of vertical support that needs to be maintained throughout demolition. When you have all that weight up top, and you have no support at the bottom, it's pretty much almost a failure situation[]. We can take as much care. We can try.

R.R. at 253a-255a.

Schaaf cautioned:

[The First Avenue Structure demolition] has been running through our head[s] for two years now, these buildings, which way to get those down safely, with or without the Market Street [Structures]. When I was made aware of the [Board's] decision to take down [the First Avenue

8

Structure] and not [the] Market Street [Structures], it's the first time in my career that I just didn't have all the answers to it. I looked back at the engineers. The engineers confirmed my suspicions.

R.R. at 255a.

In contrast, Green testified in support of PLI's denial of the Demolition Plan, explaining:

[T]his proposal . . . exceeds the . . . protection measures as prescribed by both the Building Code, as well as [the] Pittsburgh[, Pa. Code of Ordinances[4]]. A reminder that the [B]uilding [C]ode official is charge[d] with determining what adequate protection measures are. Secondarily noting that, additionally, this protective measure of demolishing adjacent structures is not an industry practice. It's not atypical for a structure to have to be demolished on a tight, urban infill site. I would further note that[,] while the property owners have the luxury of site control, if they did not have site control of the Market Street [S]tructures, I think this case and their options would be very different. Ideally everyone would love to have site control. You can't guarantee it. Keep in mind that simply because they have site control doesn't mean that demolition of those structures is necessarily the appropriate measure for protecting the public. Also noting that[,] in previous reports, [] Cornely . . . clearly identified that the demolition of [the Market Street S]tructures causes him experience [sic] and can cause the demolition of, cause the collapse of [the First Avenue Structure].

R.R. at 299a-300a. Green concluded: "PLI has assessed what has been proposed and does not determine it to meet the standard that would indicate . . . that a clear and public imminent danger exists if the Market Street [S]tructures are to remain and [the First Avenue Structure] is demolished independently from those." R.R. at 315a-316a.

---

[4] *See* https://library.municode.com/pa/pittsburgh/codes/code_of_ordinances (last visited Mar. 18, 2022).

9

When asked whether structural engineers had given input in his decision to reject the Demolition Plan, Green responded:

> [W]hile ultimately the decision rests with me as [B]uilding [C]ode official, [Troiani's Demolition Plan] has been reviewed internally by both myself, who is an architect, other architects[,] and [a] registered engineer on our staff. This was peer reviewed internally. Ultimately, the decision, due to my position in PLI as [B]uilding [C]ode official, it is ultimately my determination. All the internal staff who evaluated it agreed in terms of this assessment.

R.R. at 316a.

> Concerning the testimony of PLI's staff, Green related:

> We are not going to present that. . . . [A]gain, this is an assessment of an application made to PLI. . . . [W]hile they may be registered, they are not providing assessment in a similar fashion to what [] Cornely or [] Taylor have done. Our assessment is based on our experience and background in evaluating this type of application. We get about 60 to 100 of these a year for commercial structure[s], demolition of structures. Applying these standards, what have we seen in our collective experience, what protection measures have been presented.

R.R. at 317a.

The Pittsburgh History and Landmarks Foundation's representative Karamagi Rujumba, and adjacent property owner Jay Green, also testified on the City's behalf. After the hearing, the Board affirmed PLI's denial of the Demolition Plan, and issued its two-page written decision on September 18, 2020 (Decision).

Troiani appealed to the trial court. On January 11, 2021, the trial court affirmed the Board's Decision. Troiani appealed to this Court. *See Troiani Grp. v. City of Pittsburgh Bd. of Appeals*, 260 A.3d 1006 (Pa. Cmwlth. 2021) (*Troiani I*). On May 3, 2021, Troiani filed an Application to Request Judicial Notice and to Supplement the Record with the City's April 22, 2021 Condemnation Notice for the

10

Structure at Issue (Application to Supplement). Therein, Troiani averred that, on April 22, 2021, PLI posted "CONDEMNATION" notices (Condemnation Notices) on the First Avenue Structure and the Market Street Structures and issued "First Request for Compliance" notices (Compliance Notices) to Troiani for all of the structures, identifying the First Avenue Structure and the Market Street Structures as "**Unsafe Structures**" under the International Property Maintenance Code.[5] Application to Supplement at 2-3; Attachments A, B (emphasis added). As corrective action, the Compliance Notices directed Troiani to: seek permits to protect the public right-of-way; "stabilize" the structures; and/or seek approvals for the structures' demolition from PLI and the Department of City Planning. *Id*. Troiani attached supporting photographs of the Condemnation Notices and Compliance Notices as exhibits to its Application to Supplement. At argument before this Court on May 13, 2021, because the City's counsel represented to the Court that the City did not oppose this Court taking judicial notice of the Condemnation Notices or the Compliance Notices, this Court granted the Application to Supplement.

On July 1, 2021, this Court issued its decision in *Troiani I*, therein holding:

> [T]he Board appears to have disregarded Troiani's "strong 'critical' evidence" . . . , *Balshy* [*v. Pennsylvania State Police*,] 988 A.2d [813,] 836 [(Pa. Cmwlth. 2010)], and "has not satisfactorily addressed that evidence." *Id*. at 835. Despite Troiani's expert witnesses' lengthy and detailed testimony supporting the Market Street Structures' demolition, the Board denied the Demolition Plan with no analysis or rationale supporting its adjudication. In its Decision, the Board simply described the First Avenue Structure and the decision under review, identified the witnesses who appeared, and provided non-

---

[5] The City has adopted the International Property Maintenance Code as part of the City's Code of Ordinances. *See* Pittsburgh, Pa. Code of Ordinances § 1011.01.

11

specific overviews of the witnesses' testimony. There are no "findings and . . . reasons for the adjudication[.]" 2 Pa.C.S. § 555. The Board's denial is not "explained 'in sufficient detail to permit meaningful appellate review.'" *Fisler* [*v. State Sys. of Higher Educ., Cal. Univ. of Pa.*,] 78 A.3d [30,] 41 [(Pa. Cmwlth. 2013)] (quoting *Peak* [*v. Unemployment Comp. Bd. of Rev.*,] 501 A.2d [1383,] 1389 [(Pa. 1985)]). In fact, it is not explained at all.

*Troiani I*, 260 A.3d at 1015. Accordingly, this Court vacated the trial court's order and remanded the matter to the trial court with direction that the trial court vacate the Board's Decision and expeditiously remand the matter to the Board to issue a decision based on the existing record evidence consistent with this Court's decision.

On July 26, 2021, the Board issued its Decision After Remand, and again denied Troiani's Demolition Plan. Troiani appealed to the trial court. On September 7, 2021, the trial court reversed the Board's Decision After Remand. Appellants appealed to this Court.[6]

Appellants argue that the Board correctly rejected the Demolition Plan because, as fact-finder and an administrative board with a specialized purview and expertise, the Board concluded that the record evidence did not show that the Demolition Plan's preemptive demolition of the Market Street Structures was necessary to safely demolish the First Avenue Structure, and further "found Troiani's assertions [to the contrary] . . . lack[ed] credibility as engineering conclusions."[7] Appellants' Br. at 12. Appellants assert that "[i]n reaching its

---

[6] The standard of review in an appeal of a local agency decision, where the trial court has taken no additional evidence[, as is the case here], is whether constitutional rights have been violated, whether an error of law has been committed, or whether a finding of fact of the agency necessary to support its adjudication is not supported by substantial evidence.

*Meyer v. City of Pittsburgh Hist. Rev. Comm'n*, 201 A.3d 929, 935 n.6 (Pa. Cmwlth. 2019).

[7] Despite Appellants' characterization, the Board found only one of Troiani's assertions lacked credibility - that the protective measures outlined in PLI's September 3, 2020 denial letter

12

decision, the Board pointed to various defects in Troiani's proposal, particularly its minimal practical impact on safety . . . ." *Id.* Finally, Appellants claim that, acting in its capacity as fact-finder,

> the Board reviewed an extensive and contested record.[8] Upon review of the complex technical evidence and with the benefit of its professional experience and qualifications,[9] the Board made a well-reasoned engineering determination that demolition of the Market

---

were infeasible. *See* R.R. at 650a-651a. The Court reminds counsel that "[they] must be mindful of their own ethical duties, including the duty of candor to the tribunal. *See* Pa.R.P.C. 3.3." *Commonwealth v. Sneed*, 45 A.3d 1096, 1113 (Pa. 2012).

[8] Section B101.1 of Appendix B to the City's Amendments to the Uniform Construction Code (Appendix B) describes the Board's duties, in pertinent part: "(1) To hear and decide appeals of orders, decisions or determinations made by the building official relative to the application and interpretation of this [Uniform Construction C]ode." https://library.municode.com/pa/pittsburgh/codes/code_of_ordinances?nodeId=PIZOCO_TITTE NBU_CH1002UNCOCOAD_S1002.02CHSP (last visited Mar. 18, 2022).

[9] Section B101.2 of Appendix B provides, in relevant part:

> The [B]oard shall consist of five (5) members that are registered design professionals, licensed by the State of Pennsylvania in one (1) of the following disciplines, as follows:
>
> (1) Registered Architect.
>
> (2) Licensed Structural Engineer, with expertise in structural design.
>
> (3) Licensed Fire Protection Engineer, with expertise in the design of fire protection systems.
>
> (4) Licensed Mechanical Engineer, with expertise in the design of mechanical systems.
>
> (5) Licensed Electrical Engineer, with expertise in the design of electrical systems.
>
> (6) Licensed Plumbing Engineer, with expertise in the design of plumbing systems.

https://library.municode.com/pa/pittsburgh/codes/code_of_ordinances?nodeId=PIZOCO_TITTE NBU_CH1002UNCOCOAD_S1002.02CHSP (last visited Mar. 18, 2022). The Board's Decision After Remand identifies the following Board Members as "[a]ttending:" Yoko Tai, Registered Architect, David Price, Professional Engineer (PE), John Schneider, PE, Edward Wunderley, PE. R.R. at 646a.

> Street Structures is not necessary to safely demolish [the First Avenue Structure].

Appellants' Br. at 13-14. Troiani rejoins that the trial court correctly reversed the Board's Decision After Remand, and contends that the Board capriciously disregarded its evidence.

The law is well established that "[i]t is the function of the fact-finder to weigh the evidence before it." *Pohlig Builders, LLC v. Zoning Hearing Bd. of Schuylkill Twp.*, 25 A.3d 1260, 1266 (Pa. Cmwlth. 2011). "It is also hornbook law that [a local municipal board's] findings of fact shall not be disturbed [on appeal] if supported by substantial evidence, and that the [appellate court] may not simply substitute its own findings for the [local municipal board's] because it disagrees with them." *Ralph & Joanne's, Inc. v. Neshannock Twp. Zoning Hearing Bd.*, 550 A.2d 586, 589 (Pa. Cmwlth. 1988). In addition,

> [a] reviewing court . . . must accept the credibility determinations made by the local agency which hears the testimony, evaluates the credibility of the witnesses and serves as fact-finder. The reviewing court is not to substitute its judgment for that of the local agency. **Assuming the record demonstrates the existence of substantial evidence**, **the court is bound by the local agency's findings**.[10]

---

[10] It is axiomatic that findings of fact in a local agency's adjudication must be supported by substantial evidence. Substantial evidence is evidence that a reasonable mind might accept as sufficient to support a conclusion. An appellate court may not reweigh the evidence or make credibility determinations. However, an appellate court may "overturn a credibility determination if it is arbitrary and capricious or so fundamentally dependent on a misapprehension of material facts, or so otherwise flawed, as to render it irrational." *Agostino v. T[wp.] of Collier*, 968 A.2d 258, 263-64 (Pa. Cmwlth. 2009). A fact[-]finder capriciously disregards evidence "when there is a willful and deliberate disregard of competent testimony and relevant evidence which one of ordinary intelligence could not possibly have

14

*In re Nevling*, 907 A.2d 672, 674 (Pa. Cmwlth. 2006) (emphasis added; citations omitted).

This Court's *Troiani I* decision referenced *Kiskadden v. Pennsylvania Department of Environmental Protection*, 149 A.3d 380 (Pa. Cmwlth. 2016), wherein the *Kiskadden* Court stated:

> [This Court] may conclude that a fact[-]finder has capriciously disregarded competent evidence "when the unsuccessful party below has presented 'overwhelming evidence' upon which the adjudicator could have reached a contrary conclusion, and the adjudicator has not satisfactorily addressed that evidence by resolving conflicts in the evidence or making credibility determinations that are essential with regard to the evidence." *Balshy* . . . , 988 A.2d [at] 835-36 . . . (quoting *Grenell v. State Civ*[.] *Serv*[.] *Comm*[*'n*], 923 A.2d 533, 538 (Pa. Cmwlth. 2007)). "In other words, where there is strong 'critical' evidence that contradicts evidence supporting a contrary determination, **the adjudicator must provide an explanation as to how it made its determination**." [*Balshy*, 988 A.2d] at 836.

*Kiskadden*, 149 A.3d at 401 (emphasis added).

Having observed that "the Board appear[ed] to have disregarded Troiani's 'strong 'critical' evidence'. . . , and 'ha[d] not satisfactorily addressed that evidence[,]'" the *Troiani I* Court concluded that the Board's Decision must be vacated. *Troiani I*, 260 A.3d at 1015 (quoting *Balshy*, 988 A.2d at 836).

In contrast, in its Decision After Remand, the Board found:

> 12. As determined by the Board in its June 26, 2020 decision, the First Avenue [Structure] is in imminent danger of collapse. [*See* R.R. at 134a].

---

avoided in reaching a result." *Id*. at 264 (quoting *Arena v. Packaging Sys*[.] *Corp*[.], . . . 507 A.2d 18, 20 (Pa. 1986)).

*Spencer v. City of Reading Charter Bd.*, 97 A.3d 834, 842 (Pa. Cmwlth. 2014) (citations and footnotes omitted); *see also Lebron v. Pub. Sch. Emps.' Ret. Bd.*, 245 A.3d 300 (Pa. Cmwlth. 2020).

15

13. Troiani asserts that it is necessary to demolish the Market Street [Structures] first, lest the act of demolishing the First Avenue [Structure] causes its uncontrolled collapse into the Market Street [Structures]. In such an event, [it] believe[s] the Market Street [Structures] would also collapse and send debris into Market Street and the buildings on the opposite side. [*See* R.R. at 12a].

14. Troiani's Structural Viability Report lists the conditions that would increase the danger of collapse for the First Avenue [Structure]:

> *a) Vibrations and shifting of vertical loads on the rear wall which could occur during the top-down demolition of the building*[;]
>
> *b) The vibrations from the drilling of soil test borings for the foundation investigation of future construction*[;]
>
> ***c) Vibrations caused by the proposed demolition of the adjacent buildings***[;]
>
> ***d) Impact from debris during the demolition of the adjacent buildings***[; and]
>
> [*e)*] *Further deterioration of the structural load capacity of the interior wythes of the brick and mortar in the wall from the continuing action of rain, snow and ice. (Emphasis added.) . . . .*

[R.R. at 85a].

15. Troiani acknowledges that any demolition on the site creates risk:

> *It's my opinion it's impossible to protect those buildings on the west side of Market Street from structural damage. It all comes back to the fact that throughout the demolition process, no matter how it proceeds, there is always the risk of the worst*

16

*happening. The idea is to reduce the risk of the worst happening by demolishing the buildings to the east side of Market Street. . . .*

[R.R. at 312a].

16. When questioned about possible alternative measures for securing adjacent properties, Troiani asserted that "[t]here's no means of protecting those buildings because of the utilities and existing sidewalk vaults." [R.R. at 311a].

17. PLI noted that even under Troiani's preferred [D]emolition [P]lan, it would still need to take protection measures for the right-of-way and other properties, pursuant to the International Property Maintenance Code and City Code requirements for building demolition.

R.R. at 649a-650a (bold and italic emphasis in original).

Further, unlike the Decision which contained no analysis or rationale, the Board reasoned in its Decision After Remand:

18. Through its testimony and written reports, Troiani outlines two categories of danger involved in demolishing the First Avenue [Structure]: 1) threats to workers on the demolition site[;] and 2) threats to adjacent properties and the right-of-way.

19. **Troiani did not submit any evidence which demonstrates that the threat to workers would be increased if the Market Street [Structures] are not demolished first**. Workers will apparently have to conduct a challenging manual demolition of the parapet, roof, and sixth-floor of the First Avenue [Structure] whether or not the Market Street [Structures] are demolished first. [*See* R.R. at 17a]. Outside of this, workers will surely be positioned outside of the fall area of the First Avenue [Structure] in any scenario, which Troiani has asserted can reasonably be expected to fall west toward Market Street in an uncontrolled collapse. [*See* R.R. at 12a-13a].

17

20. The critical risk then is to the right-of-way and the buildings across Market Street. By demolishing the Market Street [Structures] first, Troiani asserts that [it] can best minimize the potential damage. **Troiani's own reports and testimony**, **however**, **make clear that this very act may itself cause the same catastrophic collapse scenario [it] seek[s] to prevent**, **which would thus endanger the adjacent right-of-way and the buildings across Market Street just the same**. Therefore, Troiani will need to take the same protection measures outlined by PLI in its September 3, 2020 denial letter[,] and required by the International Property Maintenance Code and City Code, regardless of whether the Market Street [Structures] are demolished first. [*See* R.R. at 121a, 191a].

21. Troiani asserts that these protection measures are infeasible, but the Board does not find this assertion credible. Buildings have been demolished in challenging urban locations many times before without demolishing adjacent structures as a protective measure. The existence of underground utilities beneath the street is not at all unique in the [C]ity and does not explain why the protective measures outlined in the International Property Maintenance Code and the City Code are inadequate.

22. While the Board does not doubt the good faith of Troiani's team, the evidence does not support [its] assertion that the circumstances here are so unique that [it] must take the extreme and unprecedented step of preemptively demolishing adjacent structures.

23. The Board concludes that the preemptive demolition of the Market Street [Structures] will not meaningfully impact the safety of the First Avenue [Structure's] demolition. Therefore, PLI properly denied Troiani's emergency [D]emolition [Plan] and no variance is justified.

R.R. at 650a-651a (emphasis added).

In its Decision After Remand, the Board set forth the facts which supported its decision, and explained how it reached its decision. The Decision After Remand reflects that the Board exercised its fact-finding function, determining

18

witness credibility, weighing the evidence, and reaching a reasoned decision. Therein, the Board expressed concern that, as revealed in Troiani's reports and testimony,[11] the process of preemptively demolishing the Market Street Structures could itself cause the First Avenue Structure's collapse, resulting in the same danger to the adjacent right-of-way and the buildings across Market Street as would occur if the Market Street Structures were not preemptively demolished. Thus, according to the Board, to prepare for the First Avenue Structure's possible unintended collapse during the Market Street Structures' demolition, the same protective measures would be required to protect the neighboring property whether or not the Market Street Structures were preemptively demolished. The Board's Decision After Remand reflects that the Board concluded, based on the record evidence, that Troiani's Demolition Plan of preemptively demolishing the Market Street Structures was not necessary to or would not "meaningfully impact the safety of the First Avenue [Structure's] demolition." R.R. at 651a.

It has long been acknowledged that "those persons who comprise the membership of the various administrative boards have been selected for the special skills and requisite expertise they possess in order to properly render an independent judgment." *Batoff v. State Bd. of Psych.*, 750 A.2d 835, 841 (Pa. 2000).[12]

---

[11] *See* R.R. at 61a, 85a, 252a, 269a-270a.

[12] *Cf. Woods Servs. v. Dep't of Pub. Welfare*, 803 A.2d 260, 261 (Pa. Cmwlth. 2002), *aff'd*, 839 A.2d 184 (Pa. 2003). In *Woods*, the Secretary (Secretary) of the Department of Public Welfare (DPW) granted reconsideration and set aside the Bureau of Hearings and Appeals' (BHA) decision that had approved license applications for two intermediate care facilities. The Secretary argued that the BHA failed to recognize licensing authorities' broad discretion in interpreting and applying licensing law, in that DPW favored smaller facilities than those proposed.

The *Woods* Court explained:

> Here, unlike in *Batoff* . . . , we are not reviewing an agency interpretation of professional occupational licensing law as it relates to a professional licensee. Rather, **we are reviewing DPW's denial of a license to a facility** it concedes is otherwise qualified merely

"Pennsylvania courts have consistently respected that administrative agencies comprised of persons presumably selected for their specialized experience and expertise are better qualified than any court to make a factual finding on a subject within their field." *Id.* "When an administrative agency rests its conclusion upon its expertise, courts generally respect its special competence." *No. 1 Cochran, Inc. v. Unemployment Comp. Bd. of Rev.*, 579 A.2d 1386, 1391 n.5 (Pa. Cmwlth. 1990).

> The Supreme Court of this Commonwealth has recognized the special skills and expertise possessed of those people comprising the membership of its various administrative agencies. In *Pennsylvania Labor Relations Board v. Sand's Restaurant Corp.*, . . . 240 A.2d 801 ([Pa.] 1968), the Supreme Court stated:
>
>> []An administrative agency with power after hearings to determine on the evidence in adversary proceedings whether violations of statutory commands have occurred may infer within the limits of the inquiry from the proven facts such conclusions as reasonably may be based upon the facts proven. **One of the purposes which lead to the creation of such boards is to have decisions based upon evidential facts under the particular statute made by experienced officials with an adequate appreciation of the complexities of the subject which is entrusted to their administration**. . . [.] In these cases, we but restated a rule familiar to the law and followed by all fact-finding

---

**because of the facility's failure to comply with unpublished policy**.

*Woods*, 803 A.2d at 264 (emphasis added).

The *Woods* Court's holding rested primarily on DPW's reliance on "unpublished regulations or policy." *Woods*, 803 A.2d at 264. Here, the Board - a local administrative body consisting of licensed architects and engineers - reviewed a demolition plan for its compliance with the applicable codes and, based upon the record evidence in light of its architectural and engineering expertise, determined that the proposed extraordinary preemptive demolition of the adjacent Market Street Structures could not be justified.

20

> tribunals - that **it is permissible to draw on experience in factual inquiries**.[]
>
> > *Id*. at . . . 805 (quoting in part from *Republic Aviation Corp. v. Nat*[*'l*] *Lab*[.] *Rel*[*s.*] *B*[*d.*], 324 U.S. 793, 800 . . . (1945)).

*Kundrat v. State Dental Council & Examining Bd.*, 447 A.2d 355, 358 (Pa. Cmwlth. 1982) (emphasis added).

Other decisions similarly recognize special deference to such boards/commissions. *See, e.g.*, *Bedford Downs Mgmt. Corp. v. State Harness Racing Comm'n*, 926 A.2d 908, 915 (Pa. 2007) ("[T]he [c]ommission has special expertise and judgment in making licensing decisions." (quotation marks omitted)); *Rector Church Wardens v. City of Phila. Hist. Comm'n*, 215 A.3d 1038, 1042 (Pa. Cmwlth. 2019) (recognizing the Philadelphia Historical Commission's "expertise given its mandated composition of specialists in historical, architectural, and real estate fields[]"); *Turchi v. Phila. Bd. of License & Inspection Rev.*, 20 A.3d 586 (Pa. Cmwlth. 2011) (deference afforded where Philadelphia Historical Commission composed of members with specialized knowledge, background, and expertise in the area of historic preservation); *Morelli v. Fire Code Bd. of Appeals*, 559 A.2d 90, 92 (Pa. Cmwlth. 1989) (affirming a Fire Code Board of Appeals' decision because "it is the [b]oard which has the expertise, and we will not interfere with the [b]oard's determination unless found to be arbitrary and capricious, or unsupportable on any rational basis"); *Coder v. State Bd. of Chiropractic Exam'rs*, 471 A.2d 563, 571 (Pa. Cmwlth. 1984) ("[D]ecisions of the Pennsylvania Supreme Court accord[] broad administrative discretion to public agencies in carrying out the functions conferred upon them by statutes which the legislature has necessarily been required to word in broad terms, in deference to the agency expertise needed to function in a specialized field."); *Swartwood v. Dep't of Env't Res.*, 424 A.2d 993, 996-97 (Pa. Cmwlth. 1981) ("[I]n the absence of a purely arbitrary exercise of an agency's duties or functions,

we may not substitute judicial discretion for administrative discretion in matters, such as these, which involve technical expertise and which are clearly within the special knowledge and competence of the members of the [Environmental Hearing] Board.").

In *Batoff*, this Court reversed the State Board of Psychology's (Psychology Board) order sustaining 6 of 33 ethical and professional violations charged against a psychologist. This Court concluded that the record did not support the Psychology Board's determination, and that the Psychology Board had improperly substituted its own judgment for the expert testimony presented at an initial hearing. The Pennsylvania Supreme Court reversed, reasoning that

> the Psychology Board's independent review in the face of existing expert testimony [was not] an assertion of "unfettered discretion to exercise its own independent judgment in deciding issues requiring expert testimony where expert witnesses did in fact testify about issues before the Board." *Batoff* [*v. State Bd. of Psych.*], 718 A.2d [364,] 368 [(Pa. Cmwlth. 1998)]. [Rather,] . . . there is every indication that the Psychology Board **merely filtered the existing expert testimony and ample documentary evidence through the lens of its own collective expertise**[.]

*Batoff*, 750 A.2d at 840 (emphasis added).

The *Batoff* Court concluded:

> [O]nce the Commonwealth Court decided that the Psychology Board's own collective expertise played an improper role in its conclusions as to Batoff's professional violations, the [C]ourt itself then reweighed substantially the same evidence reviewed by the [Psychology] Board and arrived at an opposite result. **By mischaracterizing the Psychology Board's decision as based solely on its own independent opinion and then factoring out that opinion as invalid, the [Commonwealth C]ourt ruled that the Psychology Board did not have the requisite substantial evidence necessary to reach a valid agency**

22

**adjudication**. A careful review of the record, however, demonstrates that **the Psychology Board's independent review of Batoff's conduct and prepared reports was**, **first**, **within [its] area of professional expertise and therefore permissible and**, **second**, **merely an additional step to ensure the verity and validity of the several experts' opinions**.

As we have determined that such **a board may factor in its own independent review of matters within its expertise, the Commonwealth Court may not discount conclusions drawn from such review**.

*Batoff*, 750 A.2d at 841 (bold and underline emphasis added). Accordingly, the *Batoff* Court held that "[the Commonwealth Court] exceeded its scope of review [by] substituting its own opinion for that of an administrative board whose members have special competence germane to the profession under scrutiny." *Id*. at 842.

Although this Court might disagree with the Board's conclusion, it may not reweigh the evidence or override the Board's credibility determinations. *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010) ("Even if an appellate court would have made a different conclusion based on the cold record, we are not in a position to reweigh the evidence and the credibility determinations of the [fact-finder]."); *see also Perry v. State Civ. Serv. Comm'n (Dep't of Lab. & Indus.)*, 38 A.3d 942 (Pa. Cmwlth. 2011). The Board's Decision After Remand demonstrates that the Board did not capriciously disregard the evidence by "willful[ly] and deliberate[ly] disregard[ing] . . . competent testimony and relevant evidence which one of ordinary intelligence could not possibly have avoided in reaching a result." *Spencer v. City of Reading Charter Bd.*, 97 A.3d 834, 842 (Pa. Cmwlth. 2014) (quoting *Agostino v. Twp. of Collier*, 968 A.2d 258, 264 (Pa. Cmwlth. 2009)). Rather, the Board's decision reflects that the Board, informed by its members' expertise, weighed the record evidence and, in doing so, disagreed with Troiani's experts regarding the need

23

for the Market Street Structures' preemptive demolition.  *See Batoff*.  Accordingly, this Court is constrained to uphold the Board's Decision After Remand.

For all of the above reasons, the trial court's order is reversed.


_____
ANNE E. COVEY, Judge


Judge McCullough did not participate in the decision in this case.

IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Troiani Group and Troy Development : 
Associates, L.P. : 
  : 
           v. : 
  : 
City of Pittsburgh Board of Appeals, : 
and City of Pittsburgh, :     No. 1127 C.D. 2021
              Appellants : 

O R D E R

AND NOW, this 21st day of March, 2022, the Allegheny County Common Pleas Court's September 7, 2021 order is reversed.

_____
ANNE E. COVEY, Judge